RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0011P (6th Cir.)
File Name: 02a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WILLIAM ROGERS, et al.,
   *Plaintiffs-Appellants,*

   *v.*

T. J. SAMSON COMMUNITY
HOSPITAL,
   *Defendant-Appellee.*

No. 00-5758

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 98-00044—Joseph H. McKinley, Jr., District Judge.

Argued: November 28, 2001

Decided and Filed: January 10, 2002

Before: CLAY and GILMAN, Circuit Judges; EDGAR,*
District Judge.

_____

  \* The Honorable R. Allan Edgar, Chief United States District Judge
for the Eastern District of Tennessee, sitting by designation.

1

---

## COUNSEL

**ARGUED:** Steven D. Downey, LAW OFFICE OF STEVEN D. DOWNEY, Bowling Green, Kentucky, for Appellants. Hiram J. Herbert, Jr., HERBERT, HERBERT & PACK, Glasgow, Kentucky, for Appellee. **ON BRIEF:** Steven D. Downey, LAW OFFICE OF STEVEN D. DOWNEY, Bowling Green, Kentucky, for Appellants. Betty R. Herbert, HERBERT, HERBERT & PACK, Glasgow, Kentucky, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge.  William C. Rogers's penis was amputated in a series of operations between April 12 and April 19, 1997 at T. J.  Samson Community Hospital in Glasgow, Kentucky. Rogers sued his doctors (who are not parties to this appeal) and the Hospital for negligent medical treatment and negligent failure to secure his informed consent for the amputation.  At trial, the court instructed the jury that certain missing evidence could be presumed to be adverse to the doctors, but did not include the Hospital in the missing evidence instruction.  Likewise, the court instructed the jury that the doctors had a duty to ensure that Rogers gave his informed consent for the amputation, but did not include the Hospital in that instruction.  The jury held the doctors, but not the Hospital, liable.  On appeal, Rogers seeks a new trial in which the jury instructions will apply the missing evidence presumption and informed consent duty to the Hospital.  For the reasons set forth below, we **VACATE** the jury verdict with respect to the Hospital and **REMAND** the case for a new trial.

each of the procedures that he underwent between April 12 and April 19, 1997.  Although the Hospital stresses that the nurses only repeated the words of the treating doctor in discussing the consent forms, such acts constitute "health care" under the broad definition of the statute.  KRS 340.40-260(7).

The ministerial nature of the nurses' efforts does not relieve the Hospital of its duty to secure Mr. Rogers's informed consent, but might be relevant to the issue of whether the nurses' care constituted negligence in light of the "accepted standard of medical . . . practice among members of the profession with similar training and experience . . . ." KRS 340.40-320(1).  In any event, because the Hospital had a statutory duty to secure Rogers's informed consent for the removal of his entire penis, the district court erred in failing to instruct the jury regarding the existence of this duty.

### III. CONCLUSION

For all of the reasons set forth above, we **VACATE** the jury verdict with respect to the Hospital and **REMAND** the case for a new trial.

Sufficient evidence exists to permit a jury to determine the factual predicate of whether the Hospital had a duty to test the tissue removed from Rogers's penis on and after April 12. Furthermore, the evidence that might have been gained from such tests would have been relevant to Rogers's case against the Hospital. The district court therefore erred in failing to include the Hospital in its instruction regarding missing evidence.

**B.    The district court erred in failing to instruct the jury that the Hospital had a statutory duty to ensure that Rogers gave his informed consent for the removal of his entire penis**

Concluding that Kentucky law limits the duty to secure a patient's informed consent to the health care provider in control of the procedure performed, the district court instructed the jury that only Dr. Slocum, who was not a Hospital employee, had such a duty. Under Kentucky Revised Statute 340.40-320, however, all "health care providers" have the duty to ensure that a patient gives his or her informed consent for a procedure. The definition of "health care provider" includes "any hospital . . . licensed under any act of this state to provide health care within this state." KRS 340.40-260(1); *Keel v. St. Elizabeth Med. Ctr.*, 842 S.W.2d 860, 862 (Ky. 1992) (holding that a hospital, as a "health care provider," has the duty to secure a patient's informed consent). "Health care" means "any act, or treatment performed or furnished..., by any health care provider to a patient during that patient's care, treatment, or confinement . . . ." KRS 340.40-260(7). The term "patient" "means a natural person who receives health care from a licenced health care provider . . . ." KRS 340.40-260(3).

Under these definitions, the Hospital, a health care provider, administered "health care" to its "patient," Rogers, when its nurses discussed the consent forms with him before each procedure. The Hospital therefore had a duty under KRS 340.40-320 to secure Rogers's informed consent for

## I.   BACKGROUND

Rogers began receiving treatment at the Hospital in March of 1997 for an abscess in his left groin. During a March 16, 1997 surgical procedure to drain the abscess, Dr. Gilman Peterson found several areas of necrotic tissue and proceeded to debride the dead material. Rogers was prescribed the antibiotics Rocephin and Gentamicin to treat the infection. After the March 16th procedure, Dr. Peterson sent a sample of the removed tissue to be cultured and tested for "sensitivities" to antibiotics. The Hospital performed the requested tests and reported that one source of the infection, Group B Streptococcus, was "sensitive" to the antibiotic Ciprofloxacin. Rogers argued at trial that the Hospital was negligent in failing to make clear in its March 16th report the fact that although Group B Streptococcus might be "sensitive" to Ciprofloxacin, such sensitivity does not mean that the infection is treatable by Ciprofloxacin.

Following the allegedly misleading March 16th sensitivity report, Rogers's treatment with the prior antibiotics ended, and he was placed on Ciprofloxacin beginning on or about March 18th. Dr. Peterson performed a second operation on March 19th to debride necrotic tissue from Rogers's groin. At this time, Rogers was diagnosed with necrotizing fasciitis, also known as Fournier's gangrene. This condition is an aggressive, potentially deadly infection that is typically treated with serial debridements of all dead and dying tissue. Dr. Peterson ordered additional blood work, chest x-rays, and a glucose tolerance test.

Rogers was discharged from the Hospital on March 25th, but he returned to the Emergency Room on March 29th, seeking treatment for continued drainage and irritation in the groin area. Dr. Peterson cleaned the affected areas, as he did again on April 1st and 2nd. Rogers next checked into the Emergency Room on April 12th, complaining that his penis had "swollen to the size of a 12-oz. Coca-Cola can." From this point on, Rogers was primarily under the care of Dr.

Peterson's partner, Dr. Milton Slocum. Dr. Slocum ordered Rogers to stop taking Ciprofloxacin and to instead take Unasyn, which is effective to treat Group B Streptococcus. By then, however, Rogers alleged that the infection and swelling was too far along to respond to the proper medication.

From April 12th to April 19th, Dr. Slocum repeatedly debrided necrotic tissue from Rogers's penis, ultimately removing the entire organ. All of the tissue debrided in these procedures was discarded rather than sent to the Hospital's laboratory for testing. Rogers alleged that the Hospital's acquiescence in the disposal of the debrided tissue from the April 12th through April 19th procedures destroyed evidence that would have proved an essential element of Rogers's case—that the Group B Streptococcus was still active due to the use of the wrong antibiotic for the 25 days prior to the change to an effective antibiotic, Unasyn, on April 12th.

Before each of the debridements that occurred between April 12th and April 19th, Rogers signed a consent form. Although each form mentioned "debridement" and two specifically mentioned debridement of the penis, none of the consent forms explicitly stated that Rogers would lose his entire penis. Rogers alleges that he did not understand that his penis was being gradually removed in its entirety because he was in a near constant state of sedation between April 12th and April 19th. By June of 1997, Rogers had been cured of his infection, but he had lost his penis and left testicle in the process.

Each of Rogers's surgeries took place at the Hospital, as did all of the laboratory tests on his tissue. Dr. Peterson and Dr. Slocum are not employees of the Hospital, but Hospital nurses treated Rogers and discussed the consent forms with him before each procedure. Rogers alleged at trial that his infection progressed to his penis and required its amputation because Dr. Peterson prescribed Ciprofloxacin, which is ineffective in treating Group B Streptococcus. Furthermore,

not to destroy evidence relevant to Rogers's case. This question should have been submitted to the jury for resolution. If the Hospital breached its regulatory duty by destroying such evidence, then the missing evidence instruction would apply to the Hospital. *Welch*, 844 F.2d at 1248 (holding that a missing evidence instruction is appropriate against a party that prejudices another party's legal rights by negligently destroying evidence).

> 2. *The tests that might have been done on the tissue debrided between April 12th and April 19th would have been relevant to prove an essential element of Rogers's claim*

The Hospital's second argument in support of its exclusion from the missing evidence instruction is that the results of any tests on the tissue debrided on and after April 12th would have been irrelevant to the issue of the Hospital's liability. This argument appears to have been found persuasive by the district court. During a discussion of the jury instructions on February 1, 2000, the court stated that "I don't think that the missing evidence and the inference that can be drawn in this case relates in any way to the claims that are against the hospital."

The treating doctors, however, attempted to excuse the fact that they prescribed Ciprofloxacin to treat Rogers's infection from March 18 through April 12th on the basis that they relied on the Hospital's March 16th report indicating that Group B Streptococcus is sensitive to Ciprofloxacin. If the tissue debrided on and after April 12th had been tested, and the Group B Streptococcus infection was found to be active and contributing to the death of still more tissue, then a jury could use this evidence to conclude that the Hospital's March 16th report was a proximate cause of the amputation. Because the missing evidence instruction would have enabled the jury to infer that the missing evidence was adverse to the Hospital, the district court's error in failing to include the Hospital in the instruction was not harmless.

Except for exclusions listed in written policies of the medical staff, tissues removed at surgery shall be macroscopically, and if necessary, microscopically examined by the [hospital] pathologist.
   (a) A list of tissues which do not routinely require microscopic examination shall be developed in writing by the pathologist or designated physician with the approval of the medical staff. . . .

*Id.*

In accordance with 920 KAR 20:016 (4)(b)(4) and the 1984 Accreditation Manual of the Joint Commission on Accreditation of Hospitals, the Hospital created a list of specimens that are exceptions to the rule that all tissue removed in the course of surgery must be examined microscopically. The Hospital's list, which is nearly identical to the one found in the Accreditation Manual, includes, among other things, "[s]pecimens that by their nature or condition do not permit fruitful examination." This being the only potentially applicable exception, the Hospital thus had a duty to test the tissue debrided from Rogers's penis unless the tissue fit within this exception.

In deposition and trial testimony, expert witnesses from both sides offered opinions regarding whether the necrotic tissue debrided from Rogers's penis on and after April 12th was susceptible to microbiological testing that would have indicated whether the Group B Streptococcus infection, which had been treated with the wrong antibiotic before April 12th, was still active after April 12th. The Hospital's witnesses testified that it is fruitless to test necrotic tissue because the cellular structure of the tissue has been destroyed. Rogers's witnesses, in contrast, cast doubt on the contention that all of the debrided tissue was so thoroughly destroyed that testing would have been useless. Because of this difference of opinion, a genuine issue of material fact exists regarding whether the tissue in question permitted "fruitful examination"—the factual predicate for the Hospital's duty

if the tissue that was debrided from his groin and penis after April 12th and later had been tested microbiologically, the tests might have shown that the Group B Streptococcus infection was still active at that time. If this was the case, Rogers argues, then the Hospital's misleading March 16th report was a proximate cause of his loss. He contends that the lack of laboratory tests on tissue debrided on April 12th and later was thus missing evidence that prevented him from proving an essential element of his case against the Hospital.

Rogers, a resident of Indiana, brought suit against the Kentucky-based doctors and Hospital, with jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332. The substantive law of Kentucky is therefore controlling. *Erie Railroad Co. v. Tomkins*, 304 U.S. 64 (1938).

Regarding the liability of the Hospital, the court instructed the jury as follows:

**Instruction No. 4:** It was the duty of T. J. Samson Community Hospital, acting through its employees and agents, to exercise toward William Rogers that degree of care and skill which is expected of reasonably competent and prudent hospitals acting under circumstances similar to those about which you have heard evidence in this case. If you believe from the evidence that T. J. Samson Community Hospital failed to comply with this duty, and that such failure was a substantial factor in causing William Rogers's injuries, then you will find for the Plaintiffs. Otherwise, you will find for the Defendant, T. J. Samson Community Hospital.

The court's instructions regarding missing evidence and informed consent read:

**Instruction No. 1:** Microbiological and surgical specimen evidence is missing in this case. If you believe its absence was caused by the unjustified or careless actions or inactions taken by Gilman Peterson, M.D., or Milton Slocum, M.D., then you may infer, but are not

required to infer, that such evidence, if available now, would have been favorable to the Plaintiffs and been adverse to that Defendant.

**Instruction No. 3:** . . . In addition to [the general duties of care owed by a physician in treating his patient], Dr. Slocum was obligated to provide information that would give a reasonable person under similar circumstances a general understanding of the surgical procedures to be performed and any medically acceptable alternative procedures or treatment.

During its deliberations, the jury submitted a question to the court, asking: "Is Title 902, Chapter 20, #6 of Health Services and Facilities law [concerning the duty of hospitals to test tissue removed during surgery] to be followed or a guideline for hospitals to follow allowing some discretion on the hospitals' part?" In response, the district court answered that "[t]he law requires all tissues removed by surgery to be submitted to the pathologist for examination. The law allows written policies of the medical staff to provide exceptions to the macroscopic or microscopic examination of such tissue by the pathologist."

On February 4, 2000, the jury returned a verdict finding the two doctors negligent and awarding Rogers $2,599,832.52. The Hospital, however, was found not liable, and was subsequently dismissed with prejudice. Both the doctors and Rogers appealed. Following a post-verdict settlement with the doctors, Rogers now pursues his appeal against the Hospital.

## II. ANALYSIS

**A.   The district court erred in excluding the Hospital from the jury instruction regarding missing evidence**

We review a jury instruction to determine whether it was a correct interpretation of the relevant law. *Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 822 (6th Cir. 2000).

If the trial court's interpretation of the law was erroneous, we must then decide whether the erroneous interpretation was prejudicial. *Id.* (stating that "[w]e will not reverse a decision on the basis of an erroneous jury instruction where the error is harmless").

"When . . . a plaintiff is unable to prove an essential element of her case due to the negligent loss or destruction of evidence by an opposing party, . . . it is proper for the trial court to create a rebuttable presumption that establishes the missing elements of the plaintiff's case that could only have been proved by the availability of the missing evidence." *Welch v. United States*, 844 F.2d 1239, 1248 (6th Cir. 1988) (holding that a hospital's failure to have its pathologist test a skull fragment that was removed from the plaintiff during surgery constituted a negligent destruction of evidence that gave rise to a rebuttable presumption that the evidence was adverse to the hospital). In the present case, the Hospital argues that the district court did not err in excluding it from the missing evidence jury instruction because (1) the Hospital had no duty to perform a microbiological test on the tissue debrided from Rogers's penis, and (2) even if the Hospital did breach its duty to test the tissue, any information gained from the tests would have been irrelevant to the issue of the Hospital's liability.

   1.   *Rogers raised a genuine issue of material fact regarding the basis for the Hospital's duty to test the tissue debrided between April 12th and April 19th*

If the Hospital had no duty to test the tissue, then there was no error in excluding the Hospital from the missing evidence instruction, because the jury could not have found that the evidence was missing due to its negligence. Kentucky health regulations, however, create a duty on the part of a hospital to examine "tissues removed at surgery." 920 KAR 20:016 (4)(b)(4). The regulation provides as follows: