**LOUISVILLE GAS AND ELECTRIC COMPANY Plaintiff**

v.

**CONTINENTAL FIELD SYSTEMS, INC. And Advanced Welding Services, LLC Defendants**

**No. 3:01 CV 387 H.**

United States District Court, W.D. Kentucky, at Louisville.

March 17, 2005.

---

Edward H. Stopher, Scott A. Davidson, Boehl, Stopher & Graves, Louisville, KY, for Plaintiff.

James Michael Wells, Goldberg & Simpson, PSC, Louisville, KY, for Continental Field Systems, Inc.

Peter J. Sewell, Ted Kozak, Sewell & Associates, Louisville, KY, for Advanced Welding Services, Inc.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

In this case, Plaintiff, Louisville Gas and Electric Company ("LG & E"), seeks to recover damages from Defendants, Continental Field Systems, Inc. ("Continental") and Advanced Welding Services, LLC ("Advanced Welding"), arising from a broken fan shaft on an electrical generating unit at the LG & E Cane Run Road facility. The damages it seeks include the cost to replace the fan shaft and some nearby equipment as well as lost revenues, such as the cost of replacement power purchases and lost profits due to LG & E's lost opportunity to sell excess electricity.

Prior to trial, Defendants have moved for dispositive resolution on three important issues. First, both Defendants have moved to dismiss the entire case due to LG & E's role in spoliation of the fan shaft evidence. Second, both Defendants have moved to dismiss LG & E's tort law claims as barred by the economic loss rule. Third, Advanced Welding has moved to

dismiss LG & E's third party beneficiary contract claim. The Court will consider each motion in turn. In doing so, the Court has the benefit of excellent memoranda and discussion of the issues with counsel at a conference.

## I.

This case arises from a process of regular maintenance conducted at LG & E's Cane Run Road facility. LG & E had contracted with Continental to provide various maintenance and repair services. As part of that maintenance program, LG & E officials noticed that water leakage may have caused pitting on the draft fan shaft located at Unit No. 6 in the facility. LG & E asked Continental for a repair recommendation and a cost estimate. To accomplish the repair, Continental recommended a process known as "sleeving." After some discussion, LG & E apparently decided to prefer repair by welding overlay and requested Continental to perform the work in that manner. For purposes of these motions it is not necessary to determine who made the final decision as to method of repair. In any event, because Continental did not have the capability to perform welding of this complexity, it called upon Advanced Welding to perform the required work.

Continental and Advanced Welding performed the required welding and maintenance procedures. The unit returned to regular operation. Within several weeks of ordinary use the fan shaft broke in two pieces at the precise location that Advanced Welding had completed the weld. The break caused extensive damage to the fan shaft unit itself and perhaps to other nearby equipment as well. LG & E replaced the entire fan shaft and repaired the fluid drive at a cost of approximately $200,000. Due to circumstances that the parties dispute, Unit No. 6 remained off line for several months required for the repairs. LG & E says that the loss of plant operation cost another $1.8 million. Additionally, LG & E says that it lost approximately $5.2 million in power sales due to the plant down time.

LG & E has asserted a variety of claims. Count I asserts breach of contract against Continental; Count II asserts breach of warranty against Continental; Count III claims negligence against Continental for failure to use ordinary care in performing the repair work; Count IV states a third party beneficiary claim against Advanced Welding based on its breach of its contract with Continental; and Count V claims negligence against Advanced Welding. LG & E says that the fan shaft pitting was not a structural defect and neither caused nor contributed to the break. It says that Continental and Advanced Welding performed the weld repair improperly and that the repair actually weakened the shaft, causing it to break under the stress of normal operations.

After the accident and the filing of the lawsuit, LG & E took possession of the two rather large parts of the broken fan shaft. It delivered the part containing the weld section to its expert consultant, Metallurgical Services Company ("Metallurgical Services"). LG & E left the other piece outside in the weather where it gathered rust and wear. Metallurgical Services performed a variety of tests on the weld section, prepared an expert report detailing its opinions and then somehow misplaced it. Later on in the litigation, Defendants requested an opportunity to examine and test the fan shaft for themselves. After considerable searching, neither LG & E nor Metallurgical Services has been able to determine the shaft's current whereabouts. They suspect that it was accidentally discarded.

## II.

Defendants have moved to dismiss the entire complaint due to the spoliation of the fan shaft evidence. Defendants say that without testing the lost piece of the fan shaft, it cannot properly rebut LG & E's charges. Defendants make a number of valid arguments. The Court has closely considered all arguments to fashion the fairest remedy in the circumstances.

■ The Sixth Circuit has defined spoliation of evidence as "the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." *Beck v. Haik*, 377 F.3d 624, 641 (6th Cir.2004). Under Federal Rule of Evidence 302, state law supplies any inference or presumption arising from the spoliation of evidence. *Id; Welsh v. United States*, 844 F.2d 1239, 1243 (6th Cir.1988). Although the parties have briefed spoliation at length, the concept seems to be not precisely applicable here. As discussed more fully below, the Court finds no evidence that Plaintiff intentionally disposed of the evidence. Thus, one cannot justify the potential inference that a party who intentionally destroys evidence does so because it would be unfavorable to his case. *See* 2 McCormick on Evidence 179–81 (John W. Strong ed., 5th ed.1999) (for intentional destruction of evidence to serve as an admission by conduct, "the circumstances of the act must manifest bad faith. Mere negligence is not enough for it does not sustain the inference of consciousness of a weak cause."). Only if conduct could create a presumption under Rule 302, need one resort to state law for guidance as to sanctions. Plaintiff's conduct warrants neither a negative inference or presumption, nor more punitive measures such as dismissal. Thus the range of remedies supplied by Kentucky law for spoliation of evidence are inapplicable.

The circumstances here present an evidentiary problem, not an occasion for sanctions or penalties. Federal law controls the admissibility of evidence, and the Court has broad discretion in controlling the admission or exclusion of evidence. *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir.2004). In fashioning a remedy in the present circumstances, the Court has gained some guidance from the Sixth Circuit, which has described the problem of lost or destroyed evidence generally: "Destruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality. The resulting penalties vary correspondingly." *Welsh*, 844 F.2d at 1246. The appropriate remedy will depend on the facts of each individual case. *Id.* at 1247. For example, in a recent medical malpractice case, the Sixth Circuit held that the district court erred in excluding the hospital defendant from a missing evidence instruction against the physician defendants. *Rogers v. T.J. Samson Comm. Hosp.*, 276 F.3d 228, 232–34 (6th Cir.2002). That instruction permitted the jury to infer, if they chose, that evidence negligently lost by the Defendants would have been favorable to the Plaintiff.[1] *Id.* at 232.

■ With the foregoing principles in mind, the Court turns to the present facts. The Court has carefully reviewed the expert testimony and makes the following findings relevant to its consideration of an

---

1. "Instruction No. 1: Microbiological and surgical specimen evidence is missing in this case. If you believe its absence was caused by the unjustified or careless actions or inactions taken by Gilman Peterson, M.D., or Milton Slocum, M.D., then you may infer, but are not required to infer, that such evidence, if available now, would have been favorable to the Plaintiffs and been adverse to that Defendant."

appropriate remedy. LG & E had a duty to preserve the important evidence in its possession. It failed in that duty, probably due to neglect by its own expert consultant, Metallurgical Services. Defendants share no fault for the lost evidence or its inability to examine that evidence. The weight of the evidence suggests that the repair work was in some way responsible for the fan shaft break. The primary issue in this case is likely to concern which party had most responsibility for determining the method of repairing the fan shaft and the method of cooling the weld. It is not clear whether analysis of the shaft is important as to this issue. It is improbable that the broken shaft resulted from a weakness that pre-existed the repairs.

Dismissal of LG & E's case in its entirety is too punitive a sanction for acts which were not purposeful and which have an uncertain importance to the case. Therefore, the Court will instruct the jury in a manner similar to the following:

> This instruction concerns the accidental loss or destruction of evidence. LG & E had possession of the broken fan shaft. Its expert, Metallurgical Services, took possession of the shaft, tested it, issued opinions concerning the accident and then misplaced the shaft. As a result of that misplacement, Defendants have been unable to examine and test the shaft or to fully explore and examine the opinions reached by Metallurgical Services. If you believe from the evidence that Defendants' inability to test the shaft prevented Defendants from rebutting any particular element of LG & E's claims, you may decide against LG & E as to that particular element. You may not consider spoliation of the evidence in any other fashion in connection with this case.[2]

The Court provides the following additional guidance to counsel. Defendants may not argue that simply because LG & E lost the fan shaft, the jury should render a verdict in favor of Defendants. They may argue that their inability to inspect the shaft prevented them from proving their theory of the case or prevented them from rebutting LG & E's theory of the case. LG & E may not argue that Defendants contributed in any way to the lost evidence or that the second piece was suitable for inspection. LG & E may argue that Defendants' inspection would not have lead to a different result and that whatever theory Defendants proposed is so improbable that any testing of the missing part could not have proved it true. The Court reserves the right to reconsider its ruling based on the evidence actually presented at trial.

### III.

Advanced Welding has moved to dismiss Count V of the complaint and Continental has moved to dismiss Count III, each on the grounds that the economic loss rule bars any claim for economic damages and negligence that actually arises from breach of contract.

The economic loss rule has evolved through the years as a principle whose purpose is to preserve the valid distinctions between tort and contract claims. *Ohio Casualty Ins. Co. v. Vermeer Manuf. Co.*, 298 F.Supp.2d 575, 578 (W.D.Ky.2004). Typically, the rule operates at the intersection of products liability remedies in tort and contractual remedies under the Uniform Commercial Code. *Id.* It provides that a party to a contract may not sue in tort to recover a purely economic loss caused to the product itself or as a direct consequence of the damaged product. *Id.* at 577; *Gooch v. E.I. Du Pont de Nemours*

2. The Court will consider modification of this instruction at a time closer to trial.

*& Co.*, 40 F.Supp.2d 863, 874–76 (W.D.Ky. 1999). Thus, the economic loss rule prevents recovery in tort for damage to the product and consequential economic losses arising from damage to that product. *Id.* A plaintiff may pursue his rights in contract or in warranty, however. This Court and others have held that Kentucky courts would apply the economic loss rule. *Bowling Green Mun. Utilities v. Thomasson Lumber Co.*, 902 F.Supp. 134 (W.D.Ky. 1995); *Gooch*, 40 F.Supp.2d at 874–75; *Ohio Cas. Ins. Co.*, 298 F.Supp.2d at 577. Nothing in the state case law since has clarified the likely tendency of Kentucky courts. Consequently, this Court remains confident of its prediction.

■ In this case, however, the Court faces a proposed further extension of the economic loss rule. All parties seem to acknowledge that both Continental and Advanced Welding were providing a service to LG & E, rather than selling a product. As yet, *no Kentucky court has specifically considered whether the economic loss rule should apply to the provision of services as well as the selling of a product.* Defendant argues that it should so apply and that, therefore, LG & E's claims in Counts III and V should be dismissed. For the reasons that follow, this Court disagrees.

Virtually every classic description of the economic loss rule pertains to and often limits its application to the sale of products. The cases make this distinction in order to preserve the distinction between the remedies available under the U.C.C. and those available in tort. Such a distinction would be immaterial here because the U.C.C. does not govern services. In the context of selling a product, the economic loss rule can limit its application to those circumstances in which the damage is sole-

ly to the product. Where services are involved, the rule could not be so easily or clearly limited. In addition, one providing a negligent service that damages related property appears to have breached a duty, rather than having breached a warranty. In such circumstances, the injured party has not suffered purely economic losses, but property damage recoverable in tort. All of these reasons suggest the conceptual difficulty of applying the economic loss rule to services.

None of the existing cases suggest that an expansion of the rule is likely. This Court's previous discussion of the economic loss rule has assumed that its application is limited to circumstances involving the sale and provision of products. *Ohio Cas. Ins. Co.*, 298 F.Supp.2d at 577; *Bowling Green Mun. Utilities*, 902 F.Supp. at 136–37. Judge McKinley's broad descriptive language in *Gooch* does not provide an analytic foundation for expanding the rule. Defendants rely heavily upon the concurring opinions of two justices in *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 583 (Ky.2004) (Keller, J., concurring). However, that concurring opinion is not persuasive evidence that Kentucky courts will apply the economic loss rule to services. *Presnell* and EH are similarly situated to LG & E and Advanced Welding in that neither pair were in privity nor maintained a contractual relationship. Consequently, the economic loss rule, which bars tort claims among those in a contractual relationship for the sale of goods, by definition could not apply. Concurring opinion neither considered nor analyzed the difficulties of applying the rule to circumstances beyond the sale of goods. Moreover, the Court's majority decided the case without any reference to the economic loss rule.[3]

3. Even if applied to services, the economic

loss rule would not prevent Plaintiff from

This Court believes that it is on sound ground in predicting that Kentucky courts would apply the economic loss rule in its classic definition. However, it would be pure speculation to suggest that Kentucky courts would adopt the broader application of the rule discussed in the *Presnell* concurrence.

## IV.

Advanced Welding has moved to dismiss Count IV of the complaint on the grounds that LG & E was merely an incidental beneficiary of the contract between Continental and Advanced Welding and, therefore, can make no contractual claim as a third party beneficiary.

■ Generally, only a party to a contract may bring an action to enforce it. However, a third party may enforce a contract made for its "actual and direct" benefit. *Sexton v. Taylor County*, 692 S.W.2d 808, 810 (Ky.App.1985). An actual and direct promise for the benefit of a third party will be sufficient to create privity between the promisor and the third party beneficiary. *Id.; Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F.Supp. 1371, 1376 (W.D.Ky.1987) (citation omitted). If that is the case, the third party is deemed to be an intended beneficiary of the contract, rather than merely an incidental beneficiary, who could not enforce it. Therefore, "the central issue to determining whether the contract is intended to benefit a third party is the relevant intent of the promisee who purchases the promise from the promisor." *United States v. Wood*, 877 F.2d 453, 457 (6th Cir.1989).

Kentucky courts have not specifically adopted the Restatement (Second) of Contracts concerning intended and incidental beneficiaries. Nevertheless, the Restatement provides a logical starting point for the discussion since Kentucky courts have relied on other sections of the Restatement dealing with third-party beneficiaries. *See, e.g., Stevens v. Stevens*, 798 S.W.2d 136, 139 (Ky.1990) (applying § 305); *Wood*, 877 F.2d at 459 (Kentucky would apply § 311). The Restatement (Second) of Contracts § 302 states:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Restatement (Second) of Contracts* § 302.

Paragraph 1(b) of § 302 concerns what is often referred to as a donee beneficiary. In those circumstances the promisor obtains a promise from the promisee to pay money to a third party. Usually this promise represents a gift from the promisee to the third party. Under such circumstances, one can see that the third party is a very direct beneficiary of the agreement between the promisor and the promisee. That circumstance does not apply here. Our circumstance is more similar to what is often referred to as a creditor beneficiary. As described in paragraph 1(a) of

---

recovering here, where Plaintiff alleges that Advanced Welding's negligence caused *property damage* and resulting consequential damages, rather than pure economic loss. In

contrast, the plaintiff in *Presnell* alleged pure economic losses in the form of extra costs incurred in working on a construction project.

§ 302 these are circumstances in which the promisee intends that the promisor's performance will satisfy a monetary obligation of the promisee to the beneficiary.

■ The Restatement gives examples of promises "to perform a supposed or asserted duty of the promisee, a promise to discharge a lien on the promisee's property, or a promise to satisfy the duty of a third person" as examples of a creditor beneficiary. After reading all the examples, the Court concludes that Continental's oral agreement with Advanced Welding provided LG & E more of an incidental benefit, rather than a direct and intended benefit. Incidental beneficiaries are those who benefit in some way from the performance of the contract even though the promisor carries out his obligations not for the specific and direct benefit of the third party. In virtually every contract, some persons benefit in this manner. Although the Restatement's illustrations are certainly not binding upon this or any other court, those illustrations have guided the Court in identifying the fault line between intended and incidental beneficiaries.

.As the following illustration shows, to discern the difference between intended and incidental beneficiaries in a contract for the discharge of debts, one need simply identify to whom payment is made:

> B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is interpreted as a promise that B will pay C, D and E, they are intended beneficiaries under Subsection (1)(a); if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries.

*Restatement (Second) of Contracts* § 302 cmt. b. Of course, the present case does not involve payment of money, but performance of a service. As such, it is not so easy to identify to whom performance is made. In this context the Court notes another illustration, this one bearing a remarkable similarity to the facts at hand:

> A [Continental] contracts to erect a building for C [LG & E]. B [Advanced Welding] then contracts with A [Continental] to supply lumber needed for the building. C [LG & E] is an incidental beneficiary to B's [Advanced Welding's] promise, and B [Advanced Welding] is an incidental beneficiary of C's [LG & E's] promise to pay A [Continental] for the building.

*Restatement (Second) of Contracts* § 302 cmt. d. This illustration seems to recognize that although third parties will often benefit from performance of service contracts, those third parties do not typically rise to the level of intended beneficiaries.

Thus, our circumstances are different than those describing an intended beneficiary in *Hendrix Mill & Lumber Co. v. Meador*, Ky., 228 Ky. 844, 16 S.W.2d 482 (1929). In that case, Allen made an assignment of an option to Hendrix, which specifically agreed to pay taxes on certain timber. Those taxes constituted an obligation that Allen owed to Meador. When Hendrix failed to pay the taxes, Meador sued Hendrix on the basis that they were the third party beneficiaries of Hendrix's agreement with Allen to pay the taxes. In that case, Meador was a direct and specific beneficiary of Hendrix's promise to pay taxes. *Id.* at 483–84.

Our circumstances more closely resemble those in *Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F.Supp. 1371 (W.D.Ky.1987). There, a subcontractor sought to recover as third-party beneficiary of a construction contract between the owner and the contractor. The subcontractor could not show that the owner of the project "intended to make a gift to

[subcontractor] or that [the contract] was executed for [subcontractor's] benefit. Neither has there been any showing that the performance of [the contract] would satisfy any real or asserted duty owed to [subcontractor] so as to make [subcontractor] a creditor beneficiary." *Id.* at 1376–77. That case, like the present case, illustrates the principles from Restatement § 302, cmt. d., discussed above.

Defendants argue that Kentucky cases suggest that the third party beneficiary must be specifically discussed or that its interests must be named in the written agreement before it can maintain a third party beneficiary action. As evidence of this, Defendants point to *King v. National Industries, Inc.*, 512 F.2d 29, 32–33 (6th Cir.1975), which interpreted Kentucky law to suggest that whether contracting parties intended to benefit a third party can only be determined by looking to the agreement itself. Defendants take the suggestion a step further and argue that only if the agreement between the promisee and the promisor contains an express intent to create an intended beneficiary may the third party maintain an action in contract against the promisee. This argument excessively expands a valid narrow point. The Court does not agree that the oral or written agreement must contain specific reference to the third party beneficiary.

Nevertheless, the Court does not find sufficient evidence of Continental's intent that its agreement with Advanced Welding specifically and directly benefit LG & E. Continental owed many duties and obligations to LG & E. It contracted with Advanced Welding to perform a limited function as part of its overall obligations. Thus, Advanced Welding cannot be said to have promised performance of a direct and specific obligation that Continental owed LG & E. To be sure, LG & E was to benefit from the agreement. However, because that benefit was not direct and specific, the Court finds LG & E to be only an incidental beneficiary and not an intended beneficiary.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Defendants have moved to dismiss all counts of the complaint on various separate grounds. The Court has reviewed the various memoranda and have discussed these issues with counsel. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion to dismiss the case in its entirety due to spoilation of evidence is DENIED. The Court will issue the jury instruction concerning loss of the evidence as described in the Memorandum Opinion and will consider other further relief as the evidence requires.

IT IS FURTHER ORDERED that Defendants' motion to dismiss certain claims based on the economic loss rule is DENIED.

IT IS FURTHER ORDERED that Advanced Welding's motion to dismiss Count IV is SUSTAINED and Count IV of the complaint is DISMISSED WITH PREJUDICE.