**NOT RECOMMENDED FOR PUBLICATION**

File Name: 12a0724n.06

**No. 11-5065**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jul 05, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| PRIME FINISH, LLC, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| ITW DELTAR IPAC, a division of Illinois Tool | ) | ON APPEAL FROM THE UNITED |
| Works, Inc., | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| Defendant-Appellee, | ) | KENTUCKY |
| | ) | |
| v. | ) | |
| | ) | |
| CAMEO, LLC, | ) | |
| | ) | |
| Intervenor-Appellant. | | |

Before: SILER, DAUGHTREY, and WHITE, Circuit Judges.

**SILER**, Circuit Judge. This case involves a contract dispute between three parties, Prime Finish, LLC, Cameo, LLC, and ITW Deltar IPAC ("ITW"), a division of Illinois Tool Works, Inc. In 2008, Prime Finish brought suit against ITW, alleging breach of a Product Supply Agreement ("Supply Agreement"). Cameo intervened, arguing that it was a third-party beneficiary to the Supply Agreement and was entitled to receive an early termination penalty from ITW. The district court granted ITW's motion for summary judgment against Cameo, determining that Cameo lacks standing. For the reasons explained below, we **REVERSE** the district court's standing determination and **REMAND** for further proceedings.

**I.**

Prime Finish paints and finishes plastic parts. It was formed in 1999 by Alex Boone and Nicholas Herbert-Jones, who served as Prime Finish's first president from 1999 to 2002. In 2004, Herbert-Jones became an independent sales representative responsible for developing sales for Prime Finish and formed Cameo to serve this purpose. Herbert-Jones is the sole owner of Cameo and remains a minority (4.6%) owner of Prime Finish.

ITW supplies automotive parts to automakers. In 2004, after being contacted by Cameo, ITW expressed interest in contracting with Prime Finish to paint and decorate ITW's automotive parts. During negotiations between Prime Finish and ITW, in which Herbert-Jones was a participant, Prime Finish explained that its financial position was not strong and its facilities were currently not capable of handling the volume of production needed by ITW. ITW, Cameo, and Prime Finish devised a solution whereby ITW would guarantee a sufficient volume of business to justify the installation of a new Prime Finish paint line. Cameo offered to provide the capital for the second paint line to facilitate this arrangement. The parties then entered into two different contracts.

The first contract was the Supply Agreement between ITW and Prime Finish, in which Prime Finish agreed to paint and decorate parts provided by ITW. The Supply Agreement recognized that Prime Finish "will be investing in a new paint line to meet [ITW's] requirements," and ITW agreed to provide a sufficient number of parts at specified prices to sustain certain revenue levels for Prime Finish. The Supply Agreement was to last four years and stated that ITW would have to pay a penalty if it terminated the contract early. This early termination penalty would be avoided if the contract was terminated because of a serious, continuing quality or delivery issue or if ITW's

customer Toyota cancelled the Camry vehicle program for which ITW supplied the parts. Cameo was not a party to and is not mentioned in the Supply Agreement between Prime Finish and ITW.

The second contract, entered into around the same time as the Supply Agreement, was the Production Service Agreement ("Production Agreement") between Prime Finish and Cameo. According to Herbert-Jones, the Supply Agreement and Production Agreement were entered into the same day, but ITW claims that the Production Agreement was actually entered into one day prior to the Supply Agreement.[1] The Production Agreement states that "Cameo will fund and place in service at [Prime Finish] a 2-booth paint-line[] and fixture painting equipment," which were both to be operated by Prime Finish. The paint line would provide Prime Finish capacity to complete ITW's orders, and the Production Agreement stated that "[a]ll ITW projects are to run through this line." Prime Finish agreed to "pay Cameo a royalty of 7% of [Prime Finish] invoiced parts that are base-coated and/or clear-coated through this line." ITW was not a party to the Production Agreement, but the contract stated that "Cameo hereby agrees and acknowledges that Cameo drafted and agrees to the terms and conditions set forth in the Product Supply Agreement between [Prime Finish] and ITW." Herbert-Jones obtained loans on behalf of Cameo and invested his own money to arrange the $1.6 million needed to fund the new paint line.

---

[1] The copy of the Supply Agreement provided by the parties is dated March 15, over two months before the Production Agreement was entered into on May 25, 2005. However, the copy is not signed, and ITW and Prime Finish apparently did not actually enter into the Supply Agreement until later. According to the parties, ITW entered into the Supply Agreement either May 25 (the same day as the Production Agreement) or May 26 (one day after the Production Agreement).

Several months after signing the Production Agreement, Cameo and Prime Finish executed a Modification Agreement, which stated that "[a]ny Penalty Payment received by Prime Finish pursuant to . . . the Production Supply Agreement between Prime Finish and ITW Deltar IPAC . . . shall be paid to Cameo."

In 2008, ITW terminated the Supply Agreement. ITW claimed that it terminated the contract due to Prime Finish's insolvency and failure to meet the agreed-upon quality standards, while Prime Finish claimed that the early termination was a breach of the Supply Agreement. Prime Finish sued ITW, and Cameo intervened, asserting its rights under the contract and to the early termination penalty. Prime Finish and ITW then moved for summary judgment against Cameo, arguing that Cameo lacked standing because it was not a party to the Supply Agreement and was not an intended creditor beneficiary. The district court agreed and granted summary judgment for ITW.

**II.**

We review the district court's granting of summary judgment *de novo*. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 311 (6th Cir. 2010). To avoid summary judgment, Cameo must demonstrate either that it is an intended creditor beneficiary of the Supply Agreement or that Prime Finish, through the Modification Agreement, adequately assigned to Cameo its right to any termination penalty from ITW. The parties agree Kentucky law applies.

**III.**

"Ordinarily, the obligations arising out of a contract are due only to those with whom it is made; a contract cannot be enforced by a person who is not a party to it or in privity with it, except . . . under certain circumstances, [such as] by a third-party beneficiary." *Presnell Constr. Managers,*

*Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 579 (Ky. 2004).  Cameo was not a party to the Supply

Agreement and therefore is not in privity with ITW.  However, "a third person may enforce a

promise made for his benefit even though he is a stranger both to the contract and to the

consideration." *Simpson v. JOC Coal, Inc.*, 677 S.W.2d 305, 308 (Ky. 1984) (quoting *Long v. Reiss*,

160 S.W.2d 668, 673 (Ky. 1942)).  Cameo claims that it "was intended by the parties to benefit from

the [Supply Agreement]," and that it therefore "has standing to sue on [the] contract."  *Presnell*

*Constr.*, 134 S.W.3d at 579.

### A.  Extrinsic Evidence

Kentucky courts have consistently held that it is appropriate to consider the surrounding

circumstances when determining whether a party is an intended beneficiary of a contract.  *See, e.g.,*

*Hendrix Mill & Lumber Co. v. Meador*, 16 S.W.2d 482, 484 (Ky. 1929) (finding a party to be a

creditor beneficiary after "taking into consideration all of the facts, and in view of the surrounding

circumstances").  The intent to benefit a third party "need not be expressed in the agreement itself;

it may be evidenced by the terms of the agreement, the surrounding circumstances, or both." *Olshan*

*Found. Repair and Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky. Ct. App. 2009).

Applying Kentucky law in this context, we have in the past looked to extrinsic evidence to

determine whether contracting parties intended to benefit a third party.  In *United States v. Wood*,

877 F.2d 453, 457-58 (6th Cir. 1989), we determined that the government was a third-party

beneficiary of a property settlement agreement in part based on extrinsic evidence in the form of an

"uncontradicted affidavit" from an IRS officer who stated that the contracting parties intended to

benefit the government by paying certain tax liabilities.  *See also Louisville Gas and Elec. Co. v.*

*Continental Field Sys., Inc.*, 420 F. Supp. 2d 764, 772 (W.D. Ky. 2005) ("The Court does not agree that the oral or written agreement must contain specific reference to the third party beneficiary.").[2]

ITW relies on state cases for the proposition that "[e]xtrinsic evidence cannot be admitted to vary the terms of a written instrument in the absence of an ambiguous [agreement]." *See Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000). While this is undoubtedly a general principle of Kentucky contract law, the cases cited by ITW do not involve third-party beneficiary analysis. The inquiry into third-party beneficiary status is different from ordinary contract interpretation, and Kentucky law directs courts to consider surrounding circumstances in the third-party beneficiary context. *See Olshan Found.*, 276 S.W.3d at 831 ("[Plaintiffs] cannot rely upon contract law . . ., [but] may seek to enforce the terms of the contract by showing that the parties to the contract intended by their agreement to benefit the third parties directly.").

ITW cites one unpublished case from this court involving a third-party beneficiary claim, *Bariteau v. PNC Fin. Servs. Grp., Inc.*, 285 F. App'x 218, 222 (6th Cir. 2008), in which a party relied on an affidavit to support its claim that it was an intended beneficiary of a contract. We stated that "when an agreement itself establishes that an individual is not a third-party beneficiary of it, extrinsic evidence generally has little role to play." *Id.* However, we still went on to examine the affidavit and concluded that it was insufficient to establish that the party was more than a mere

---

[2] This approach is consistent with the Restatement and leading treatises on contract law. *See* Restatement (Second) of Contracts § 308 ("It is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made."); 13 Williston on Contracts § 37:8 (4th ed.) ("[I]n most jurisdictions the intent to benefit a third party can be shown not only by the contract's express language but by the surrounding circumstances.").

incidental beneficiary of the contract. *Id. Bariteau* is best understood as simply explaining that extrinsic evidence should not be used to contradict an agreement that unambiguously establishes that a party is *not* a third party beneficiary. In this case, the Supply Agreement does not mention Cameo and does not unambiguously establish that it is not a third-party beneficiary of the contract.

In determining whether Cameo is an intended third-party beneficiary of the Supply Agreement, we "look first to the . . . agreement itself," *King v. Nat'l Indus., Inc.*, 512 F.2d 29, 32 (6th Cir. 1975), but we also consider evidence of the surrounding circumstances. In this case, the relevant evidence is the Production and Modification Agreements between Cameo and Prime Finish and the uncontroverted affidavit of Herbert-Jones, which describes details of the contract negotiations and formation.

**B. Cameo Has Standing as an Intended Creditor Beneficiary of the Supply Agreement**

"[A] third-party who was intended by the parties to benefit from the contract, namely, a donee or a creditor beneficiary, has standing to sue on a contract." *Presnell Constr.*, 134 S.W.3d at 579. Cameo clearly stood to benefit from the contract between Prime Finish and ITW—it received a commission as Prime Finish's sales representative, it would receive a benefit from the revenues on the new paint line, and most important, the guaranteed revenue provisions and the early termination penalty clause provided the money to assure repayment to Cameo. The question in this case is whether Cameo should be considered an intended creditor beneficiary or merely an incidental beneficiary of the Supply Agreement. "[T]he mere fact that a third person would be incidentally benefited does not give him a right to sue for [a contract's] breach." *Simpson*, 677 S.W.2d at 308

(internal quotation marks omitted); *accord Presnell Constr.*, 134 S.W.3d at 579 ("[A]n incidental beneficiary does not acquire [standing].").

For Cameo to be considered an intended creditor beneficiary, it must show that "the promisee's expressed intent is that the third party is to receive the performance of the contract in satisfaction of any actual or supposed duty or liability of the promisee to the beneficiary." *Presnell Constr.*, 134 S.W.3d at 579 (quoting *Sexton v. Taylor Cnty.*, 692 S.W.2d 808, 810 (Ky. Ct. App. 1985)). "In short, all that is necessary is that there be consideration for the agreement flowing to the promisor and that the promisee intends to extract a promise directly benefitting the third party." *Simpson*, 677 S.W.2d at 309. In this arrangement, ITW is the promisor, Prime Finish is the promisee, and Cameo is the third-party beneficiary.

Prime Finish, the promisee, "intend[ed] to extract a promise [from ITW] directly benefitting the third party[, Cameo]." *See id.* Cameo was prominently involved in the contract negotiations and formation. According to Herbert-Jones's affidavit, he was present at many meetings between ITW and Prime Finish prior to the formation of the Supply Agreement. He was involved in the drafting of the Supply Agreement and emailed with ITW officers about the contract during negotiations. Moreover, the Production Agreement between Cameo and Prime Finish expressly acknowledges Cameo's role in drafting the Supply Agreement. Cameo is not mentioned in the Supply Agreement–which, as explained above, is not necessary under Kentucky law, *see Olshan Found.*, 276 S.W.3d at 831–but it was prominently involved throughout the Supply Agreement negotiation process. Although Cameo's involvement is not sufficient, on its own, to confer third-party

beneficiary status, it does show that the parties were aware of its role and position in the arrangement.

The parties' familiarity with Cameo and its role distinguishes two of the cases relied upon by ITW. In *Bariteau*, where the court found the plaintiff to be merely an incidental beneficiary, the party claiming to be an intended beneficiary "was not even an investor in the company at the time the agreement was executed and did not learn of the agreement until after the company's bankruptcy." *Bariteau*, 285 F. App'x at 221. In *Long*, the Kentucky Court of Appeals held that a company was not a third-party beneficiary when the company "was not then even in existence . . . until . . . after the contract was entered into." *Long*, 160 S.W.2d at 674. In this case, both ITW and Prime Finish worked closely with Cameo throughout the contract formation process.

Furthermore, the Production Agreement between Cameo and Prime Finish is strong evidence that Prime Finish intended for Cameo to directly benefit from the Supply Agreement. According to both parties, the Production Agreement was contemporaneous with the Supply Agreement (either executed the same day or one day prior). Under the Production Agreement, Cameo agreed to "fund and place in service" a new paint line at Prime Finish's facilities. This paint line would make it possible for Prime Finish to meet ITW's high volume of business. In return, Prime Finish agreed to "pay Cameo a royalty of 7% of [Prime Finish] invoiced parts that are base-coated and/or clear-coated through this line." As all ITW projects were to run through this new line, Prime Finish was agreeing to pay Cameo a share of the money it received from ITW. Cameo thus directly benefitted from the Supply Agreement by receiving a share of the revenue from Prime Finish's sale of finished parts to ITW under the contract. The royalty payments to Cameo, agreed to by Prime Finish either

the same day or one day prior to the Supply Agreement, demonstrate that Prime Finish intended for Cameo to directly benefit from the Supply Agreement when Prime Finish entered into the contract with ITW. The guaranteed revenue provisions of the Supply Agreement together with the early termination penalty were intended to protect Cameo's investment in the additional paint line.

Lastly, the arrangement between ITW, Prime Finish, and Cameo is different from a normal subcontracting relationship. ITW argues that Cameo is an incidental beneficiary because it is similar to a subcontractor, which does not have standing to sue on a primary contract between the promisor and promisee. "Incidental beneficiaries are those who benefit in some way from the performance of the contract even though the promisor carries out his obligations not for the specific and direct benefit of the third party." *Louisville Gas and Elec.*, 420 F. Supp. 2d at 771. ITW points to a comment to the Restatement (Second) of Contracts, which provides a subcontracting example:

> A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. . . . B is an incidental beneficiary of C's promise to pay A for the building.

Restatement (Second) of Contracts § 302 cmt. e, illus. 19. ITW claims that Prime Finish essentially subcontracted with Cameo for the creation of a new paint line and that Cameo—just like B, who supplies lumber to A in the example above—will only incidentally benefit from the original agreement. In the normal subcontracting example, however, the subcontractor is not heavily involved in the main contract negotiations, as was the case with Cameo and the Supply Agreement. In other words, and in terms of the Restatement example, B does not negotiate and help to form the original contract between A and C. Nor does the subcontractor usually loan funds to make the primary contract possible. Also, Cameo "specific[ally] and direct[ly]" benefits from the Supply

Agreement because, rather than a set price, Cameo receives a 7% royalty on ITW invoices. *See Louisville Gas and Elec.*, 420 F. Supp. 2d at 771. While it is true that Prime Finish acts as a pass-through in that ITW does not pay Cameo directly, in this case what is important is that Cameo's payment directly correlates to ITW invoices on parts produced on the new line created by Cameo, and the negotiated revenue guarantee and penalty provision were clearly intended to secure repayment to Cameo.

In these ways, Cameo is distinguished from mere incidental beneficiaries of contracts. Because of Cameo's prominent involvement in the Supply Agreement negotiations and Prime Finish's intent that Cameo directly benefit from and be secured by the ITW business created by the new paint line installed by Cameo, Cameo has standing to sue ITW as an intended creditor beneficiary under the Supply Agreement.

## IV.

Cameo further argues that Prime Finish assigned to Cameo its right to an early termination fee contemplated by the Production Supply Agreement. Although Cameo has standing to sue ITW based on its status as a third-party beneficiary, Cameo fails to demonstrate that Prime Finish effectively assigned to Cameo its right to the early termination penalty.

Exhibit B to the Supply Agreement between Prime Finish and Cameo provided that, "[i]f ITW Deltar terminates its contract early, for any reason, other than outlined in the exception below, ITW will pay [a] termination penalty" based on the number of months the contract was in force. Cameo argues that Prime Finish assigned its right to this early termination penalty in a Modification

Agreement to the Production Agreement between Cameo and Prime Finish. The Modification

Agreement states in relevant part:

> Any Penalty Payment received by Prime Finish pursuant to . . . the Production Supply
> Agreement between Prime Finish and ITW Deltar IPAC . . . as a result of failure to
> place the minimum orders required under Exhibit A of that Agreement shall be paid
> to Cameo.

"Any language, however informal, if it shows the intention of the owner . . . to transfer, so

that it be the property of the transferee, will amount to an equitable assignment. Such effect may be

given to any order, writing or act which manifests an intention to transfer." *Commonwealth v.

Wilhoit*, 120 S.W.2d 670, 675 (Ky. 1938). The language must "sufficiently identif[y] the property

and show[] the intention of the owner to transfer it." *McPhail v. John Hancock Mut. Life Ins. Co.*,

108 F. Supp. 902, 906 (W.D. Ky. 1952).

As Cameo points out, the Supply Agreement between Prime Finish and ITW did not contain

a non-assignment clause, and under Kentucky law "no particular form of instrument or fixed words

is necessary" to create an assignment. *See Wilhoit*, 120 S.W.2d at 675. However, in this case, the

Modification Agreement is insufficient to effectuate a present transfer of the right to collect directly

from ITW. The agreement states that "[a]ny Penalty Payment *received by Prime Finish . . . shall be

paid to* Cameo." This language describes a scenario in which Prime Finish collects the early

termination penalty and then pays that penalty to Cameo. For an assignment to be effective, "[t]he

assignor must not retain control over the property assigned, the authority to collect, or the power to

revoke." 6 Am. Jur. 2d *Assignments* § 98. Under the plain language of the Modification Agreement,

Prime Finish retains the authority to collect the early termination penalty before paying it to Cameo.

As one Kentucky case explains, "[t]he true test of what constitutes an assignment is whether the debtor would be justified in paying the debt to the one claiming to be the assignee." *Marshall's Creditors v. Marshall's Estate*, 14 S.W.2d 168, 169 (Ky. 1928). In this case, Prime Finish retained the right to collect, and ITW would not be justified in paying Cameo directly.

**V.**

We express no opinion as to any potential relief Cameo may be entitled to under the Supply Agreement. We merely hold that Cameo has standing to sue ITW because Cameo is a third party beneficiary of the contract.

**REVERSED AND REMANDED** for further proceedings consistent with this decision.

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part.

Citing *Olshan Foundation Repair and Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky. Ct. App. 2009), the majority notes that "Kentucky law directs courts to consider surrounding circumstances in the third party beneficiary context." Majority Opinion at 6. After examining extrinsic evidence in this case, the majority concludes that Cameo, LLC, was an intended beneficiary of a Product Supply Agreement between Prime Finish, LLC, and ITW Deltar IPAC, and can, therefore, intervene in Prime Finish's suit against ITW for breach of the agreement. My evaluation of the "surrounding circumstances" leads me to the opposite conclusion. I thus respectfully dissent from the majority's determination on Cameo's third-party-beneficiary assertion. I do, however, concur in Part IV of the majority's opinion that holds that Prime Finish did not assign to Cameo its right to receive early-termination penalty payments from ITW.

In light of its decision that Prime Finish did *not* effectively assign to Cameo the right to receive penalty payments from ITW, the majority correctly notes that, "[t]o avoid summary judgment, Cameo must demonstrate . . . that it is an intended creditor beneficiary of the Supply Agreement . . . ." Majority Opinion at 4. Indeed, the federal courts and the courts of Kentucky have long recognized that before a non-party to a contract may sue for the breach of that agreement, the non-party must establish that the contract was entered into for its direct benefit. In *German Alliance Insurance Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912), for example, the United States Supreme Court explained, "Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his *direct benefit*." (Emphasis added.) Likewise, the highest court in Kentucky has pointedly

held, "It must appear, in order that a third person may derive a benefit from a contract between two other parties, that the contract was made and entered into *directly or primarily for the benefit of such third person*." *Long v. Reiss*, 160 S.W.2d 668, 674 (1942) (emphasis added).

An examination of the wording of the Supply Agreement in this case contains no indication whatever of an intent on the part of ITW or Prime Finish to benefit Cameo directly or primarily. In fact, Cameo's name appears nowhere in the wording of the agreement between the actual parties to the contract.

To counteract that obvious roadblock to its attempt to convince the judiciary of its stake in the agreement, Cameo advances a two-pronged argument. First, the company asserts that "it was prominently involved throughout the Supply Agreement negotiation process." Majority Opinion at 8. Nicholas Herbert-Jones, the sole owner of Cameo, emphasizes that "he was present at many meetings between ITW and Prime Finish prior to the formation of the Supply Agreement," and that "[h]e was involved in the drafting of the Supply Agreement and emailed with ITW officers about the contract during negotiations." *Id.* In fact, in the separate Production Agreement between Prime Finish and Cameo, the following language appears: "Cameo hereby agrees and acknowledges that Cameo drafted and agrees to the terms and conditions set forth in the Product Supply Agreement between [Prime Finish] and ITW."

Rather than supporting Cameo's third-party-beneficiary status, however, such information actually militates *against* the position Cameo seeks to advance on appeal. In Kentucky, as in almost all other jurisdictions, any ambiguity in a contract is to be construed against the drafter of the contract language. *See, e.g.*, *Theatre Realty Co. v. P.H. Meyer Co.*, 48 S.W.2d 1, 2 (Ky. 1932);

*Weinberg v. Gharai*, 338 S.W.3d 307, 313 (Ky. Ct. App. 2011). Because Cameo admittedly crafted the language that defines the agreement, we should presume that, had Cameo intended to preserve its rights *against ITW* for receipt of the penalty payments, it would have included such an explicit provision in the very contract that it drafted. Its failure to do so thus should be taken as an indication that Cameo was not intended to be a direct or primary beneficiary of the Supply Agreement between Prime Finish and ITW.

Cameo next contends, however, that the nearly contemporaneous Production Agreement *between Prime Finish and Cameo* somehow evidences an intent on the part of *ITW* to obligate itself to Cameo. Although both the Production Agreement and the subsequent Modification Agreement between Prime Finish and Cameo define the rights and obligations of those entities vis-a-vis each other, the fact remains that neither agreement creates any right of Cameo against ITW directly.

In the absence of evidence that ITW ever intended to benefit Cameo directly by agreeing with Prime Finish to the terms of the Production Agreement, I conclude that the district court appropriately granted ITW summary judgment on Cameo's intervening complaint. I thus respectfully dissent from the majority's conclusion to the contrary.