**Olakuyode O. NEJO, Plaintiff–Appellant,**

v.

**TAMAROFF BUICK HONDA ISUZU NISSAN, Defendant–Appellee.**

No. 02–1794.

United States Court of Appeals, Sixth Circuit.

Feb. 23, 2004.

Mark Granzotto, Royal Oak, MI, for Plaintiff–Appellant.

Michael L. Updike, Charles E. Griffiths, Secrest, Wardle, Lynch, Hampton, Truex & Morley, Farmington Hills, MI, for Defendant–Appellee.

Before BOGGS, Chief Judge; and BATCHELDER and SUTTON, Circuit Judges.

PER CURIAM.

In this diversity case under Michigan law, plaintiff Olukayode O. Nejo appeals from the district court's denial of his motion for a new trial under Fed.R.Civ.P. 59, which followed a special jury verdict for the defense on the ground of no negligence. On January 4, 1999, Mr. Nejo left the dealership of defendant Tamaroff Buick Honda Isuzu Nissan, where he had

just had his SUV's tires rotated. Shortly thereafter, Nejo's vehicle was found by the side of the road with its right front wheel off. Nejo sued Tamaroff for negligence, claiming that the wheel flew off as he drove, causing him to lose control, strike his head, and suffer serious cognitive injuries. On appeal, he argues that because the jury's verdict rested on a finding of no negligence by Tamaroff (rather than on a lack of causation or damages, elements that Nejo concedes were disputed), the verdict was against the great weight of the evidence and requires a new trial.

Nejo also challenges the correctness of a jury instruction. Because Nejo could not produce certain parts taken from his damaged vehicle, the district court gave Michigan Standard Jury Instruction (SJI) 6.01(c), which told the jury that it "may" infer that the parts would have been evidence adverse to Nejo's claims. Nejo argues that the missing parts were originally under Tamaroff's control, not his, and thus that giving the instruction was an abuse of discretion.

For the reasons explained below, we affirm. While the jury's special verdict was perhaps surprising, the district court's decision to deny a new trial was not an abuse of discretion. Nor did the court abuse its discretion in deciding to give SJI 6.01(c).

## I

## A

Mr. Nejo studied architecture and engineering in his native Nigeria before coming to the United States in 1987 for work and graduate study. In 1995 he entered a doctoral program in urban planning at the University of Michigan. He was awarded several fellowships, and his professors testified at trial to his high ability. He eventually won an award for the best dissertation in Michigan's architecture department (after the incident at issue here) and had secured a consulting job with PricewaterhouseCoopers in Chicago.

On January 4, 1999, Nejo took his Isuzu SUV to Tamaroff for routine wheel and tire maintenance. He alleges that Tamaroff negligently failed to secure the right front wheel after maintenance by properly re-tightening the lug nuts. As a result, Nejo claims, he had an accident on I–696, approximately three to four miles from the Tamaroff dealership. Nejo testified at trial that the right front wheel came off, the Isuzu lurched violently to the left, then zigzagged across several traffic lanes, ending up on the right side of the road. Nejo said he struck his head and lost consciousness. The parties presented no witnesses who had seen the events happen except for Nejo himself.

Nejo further claimed that after his accident he developed significant cognitive deficits. His concentration and attention span were reduced and his memory was greatly impaired. After graduation, he was unable to complete his orientation program at Pricewaterhouse, and went on medical leave. He has never returned to work, at Pricewaterhouse or elsewhere.

Nejo sued Tamaroff in federal court on September 25, 2000, slightly more than a year and a half after the accident.

In considering an appeal from the district court's denial of a new trial, we must "compare the opposing proofs" and "weigh the evidence," assessing the relevant evidence as a whole. *Porter v. Lima Mem. Hosp.*, 995 F.2d 629, 635 (6th Cir.1993) (quoting *J.C. Wyckoff & Assoc. v. Std. Fire Ins.*, 936 F.2d 1474, 1476 (6th Cir.1991)). Much of the testimony at trial dealt with the extent of Nejo's alleged injuries, which is not directly relevant to the issue of negligence on which the jury's verdict rested. However, we believe this testimony, too, should be considered in weighing the district court's refusal to grant a new trial.

Tamaroff strongly challenged Nejo's credibility in the course of disputing the elements of causation and damages, and this is relevant to the question of whether the jury could reasonably disbelieve Nejo's account of the events as a whole. Indeed, some of Tamaroff's evidence suggested the rather dramatic theory that Nejo had staged the accident in some fashion.

**B**

Nejo presented fourteen witnesses. One of the most important was Thomas Brady, a motorist who found Nejo's SUV stopped in the snow on I-696 on January 4, 1999, and stopped to assist him. Brady had never met Nejo before encountering him at the roadside. He found Nejo's vehicle missing its right wheel, approached, and spoke with Nejo. Brady noticed that Nejo had blood on or near his nose, though Brady could not make out whether he was actually bleeding. Brady testified that Nejo was coherent, but "a little out of it" and "dazed." He thought that Nejo was "pretty lucky" not to have hit any other cars if his wheel came off in traffic. Brady reported that his first reaction was, "Well, you know, someone obviously didn't put your lug nuts on." Brady found a loose wheel in the snow about 40 to 50 feet from Nejo's vehicle. He searched for the lug nuts, but did not find them.

Brady took Nejo to the pool hall where Brady had been heading, so that Nejo could telephone for a tow truck. At Brady's urging, Nejo also called Tamaroff from the pool hall to report the accident. Eventually, Brady took Nejo to the emergency room, where he was diagnosed with a chest contusion and a neck sprain and released. His emergency room records did not show evidence of a head injury.

Several of Nejo's witnesses were physicians or psychologists who had treated him. Their testimony was that Nejo was in basically good health prior to the events of January 4, 1999, but that after the alleged accident, he became slow and distracted, with difficulty concentrating and remembering things. He displayed clear signs of a loss of cognitive ability, and was also depressed and anxious. Nejo's principal clinical psychiatrist, Dr. Steven Rothke, concluded after examining Nejo that he had suffered a traumatic brain injury. Dr. Rothke and the other physicians called by Nejo all testified that, in their opinion, Nejo was not feigning his symptoms. However, Dr. Rothke admitted that Nejo's subjective complaints of pain and the like exceeded the objective findings revealed by physical tests. In particular, both Dr. Rothke and another clinical psychiatrist, Dr. Caroline Loeb, conducted various MRI and EEG tests on Nejo, all of which came back normal. Nejo's rehabilitation expert, Dr. Susan Keeshin, wrote in a report that there was "no physiologic or musculoskeletal reason" for Nejo's complaints.

Nejo called two witnesses to testify on mechanical issues. One was Christopher Tubbs, the mechanic who worked on Nejo's car after it was towed from the highway. Tubbs opined that the accident must have occurred from faulty installation of the lug nuts or a defect in the wheel. At the same time, although Tubbs replaced several bent and scraped parts from the right front underbody of Nejo's SUV, he found no damage to the vehicle's fender or sheet metal, as might have been expected from a wheel flying off at highway speed. Nor, significantly, was there damage to the right front wheel hub, or to the studs on the hub. Tubbs acknowledged that normally, when a wheel comes off a hub, the studs are damaged. Indeed, while he had seen five or six previous incidents in which wheels came off a vehicle unexpectedly, in all of them, the studs were damaged, unlike those on Nejo's SUV. Tubbs testified that after repairing the SUV, he gave the

damaged parts to Nejo, placing them in the back of the vehicle. Nejo was unable to produce these parts at trial.

Nejo also presented pointed testimony from an accident reconstruction expert, James Stocke. Mr. Stocke delivered his opinion that the wheel came off because Tamaroff had not properly tightened the lug nuts. Instead, the lug nuts had probably been merely "finger tightened," causing them to come loose when the car was driven. Stocke also opined that the damage to the parts on the underside of Nejo's car could not have been produced deliberately by, for example, hoisting the vehicle up on a jack, then letting the chassis fall off the jack. Challenged on cross-examination, Stocke maintained that the absence of damage to the right front lug struts or the sheet metal of the vehicle did not alter his opinion that the wheel flew off due to Tamaroff's faulty installation.

Nejo himself also took the stand. He explained his failure to produce the damaged auto parts for trial by testifying that he had lost them and had no memory of what happened to them after Tubbs gave them to him. Concerning the accident itself, Nejo testified that his SUV veered sharply left, then zig-zagged back and forth across several lanes of traffic before coming to rest on the right. He hit his head on the window or window frame and lost consciousness. Nejo said he later called Tamaroff from the pool hall and asked the dealer to send a tow truck and rental car, but Tamaroff did not do so. Nejo testified in detail about the decline in his mental abilities that he claimed followed the accident. He claimed that his faculties grew worse after he finished defending his dissertation.

Under cross-examination, Nejo admitted that the various physicians he had talked to in the time since the accident had recorded several different accounts from him of how the accident happened. One doctor recorded that Nejo hit oncoming traffic; another, that he blew a tire and hit the guardrail; another, that the car plowed through dirt and came to rest up against a sand pile. Nejo contended that the doctors had made mistakes in recording his statements. In addition, he conceded that he was only 50 percent done with the dissertation at the time of the accident, yet went on to complete the dissertation with honors after his alleged injury.

Tamaroff presented six witnesses. One was Kenneth Cetnar, the Tamaroff mechanic who rotated the tires on Nejo's SUV. Cetnar testified that he could not specifically remember working on Nejo's vehicle, but that when he rotated the tires on a customer's car, he always re-tightened the lug nuts with a pneumatic wrench. Cetnar conceded that Tamaroff's maintenance records on Nejo's vehicle showed that it had no pre-existing mechanical defects that might have caused a wheel to fly off. He added that he did not know of any way a wheel could come off a vehicle as Nejo claimed his wheel did, other than by a failure to re-attach the lug nuts or to tighten them properly. But Cetnar also testified that in his experience, if a wheel did fly off the lug studs of a car like Nejo's Isuzu, it would damage the studs, yet Nejo's studs were not damaged. Finally, Cetnar testified that it was standard procedure at Tamaroff to take each customer's car for a half-mile test drive before returning it to him. He opined that if he had reinstalled Nejo's lug nuts improperly, he probably would not have been able to complete the test drive.

Tamaroff's service manager, Kevin Klingensmith, reinforced Cetnar's testimony, stating that his mechanics always re-tightened the lug nuts on customers' vehicles with a pneumatic wrench. Klingensmith added that in 25 years of experience, he had never seen a wheel come off the lug

assembly while in motion without damaging the lug assembly. Klingensmith also described the phone conversation when Nejo called Tamaroff from the pool hall on January 4, 1999. Nejo stated that the wheel had come off of his SUV, and asked for a tow truck and a replacement rental car. Klingensmith replied that he would send a tow truck, and Nejo could ride back in the truck; Tamaroff would then investigate the damage to the SUV and the wheel assembly to see if it had been negligent. If so, Tamaroff would authorize repairs and a rental car. Klingensmith testified that Nejo replied: "you're telling me you're not going to do anything for me." Klingensmith demurred and repeated what he had told Nejo. Nejo then repeated, "you're not going to do anything for me," and then hung up.

Tamaroff also offered medical witnesses who contested Dr. Rothke's diagnosis of a traumatic brain injury. One of them, Dr. Frank Judge, gave Nejo an independent medical examination on June 9, 1999. Using an MRI, Judge found a herniated disk and a bulging disk in Nejo's neck. He testified, however, that the chance of Nejo having a traumatic brain injury was "very, very, very small." The sensory symptoms Nejo claimed to be undergoing were most consistent with a massive injury to the spinal cord; but if that were the case, Dr. Judge opined, Nejo would have lost the use of his left arm, which worked fine. Dr. Judge could not find any physical symptoms that matched Nejo's complaints. He testified that Nejo was embellishing his symptoms.

A psychologist, Dr. John O'Leary, gave pointed testimony relating to Nejo's credibility. O'Leary examined Nejo and testified that he did not have any psychological impairments consistent with the injuries he claimed. In O'Leary's opinion, Nejo displayed clear symptoms of malingering and exaggerating his symptoms. On the MMPI psychological test he scored very high on the "FAKE BAD" scale used to ascertain malingering. Indeed, on one memory test Dr. O'Leary administered, Nejo performed so badly his results were barely distinguishable from random chance. Even people with severe brain injuries typically did better than that, O'Leary testified.

Finally, Tamaroff presented an accident reconstruction expert, Weldon Greiger. Mr. Greiger testified at trial that in light of the evidence, it was "certainly a possibility" that Nejo had simply staged the accident. He noted that he would be able to opine with more confidence on whether the accident was staged if he could inspect the parts taken from Nejo's truck, which Nejo had not produced. In any event, Greiger opined, the accident did not happen the way Nejo said it did. First, there was no reason the vehicle would zig-zag and lurch to the left, as Nejo said it did, simply because the right front wheel flew off. Second, there was only a 20 to 30% chance that a wheel could come off a car moving at speed without damaging the lug studs or the body panels. The existing damage to the underside of Nejo's car could have happened by dropping the car from a jack, or when it was winched onto the tow truck. Finally, Greiger opined that if Tamaroff's mechanic had failed to attach the lug nuts to Nejo's right wheel, the wheel would have come off within a half mile or so, not three or four miles away as Mr. Nejo claimed occurred.

In cross-examination, Greiger admitted that in his deposition, he had answered "no" when asked whether he had an opinion that Nejo staged the accident, while at trial, he expressed the arguably different view just noted.

There was no rebuttal. Nejo did not move for a directed verdict on the issue of Tamaroff's negligence.

At the close of all testimony, Tamaroff requested an instruction telling the jury that it could draw an adverse inference from Nejo's failure to preserve the damaged parts removed from his vehicle. Nejo opposed the motion, arguing that on the day of the accident, he had offered Tamaroff the chance to retrieve his vehicle and examine the parts, when he called Tamaroff from the pool hall. In the end, the district court granted the defendant's request. It gave the jury Michigan Standard Jury Instruction 6.01(c), which states (as adapted):

> The plaintiff in this case has not offered the parts of the vehicle that he received back when the vehicle was repaired. As this evidence was under the control of plaintiff and could have been produced by him, you may infer that the evidence would have been adverse to the plaintiff, if you believe that no reasonable excuse for plaintiff's failure to produce the evidence has been shown.

The jury received the case on February 21, 2002, and returned the special verdict form on the next day. It answered the first question on the verdict form ("Was the defendant negligent? Answer: N"), leaving the other questions blank as instructed.

Plaintiff's counsel moved for a new trial pursuant to Fed.R.Civ.P. 59. He argued that the great weight of the evidence favored the conclusion that Tamaroff had negligently failed to re-tighten the lug nuts on Nejo's car. The district judge denied the motion. In her view, while "this Court's decision may have been different," the "bottom line is that there was evidence [from] which the jury could conclude circumstantially that the ... accident did not occur as plaintiff said it did."

Nejo timely appealed the denial of his motion for a new trial. He also appealed from the judgment on the ground that the trial court's giving of the "adverse inference" instruction was improper.

## II

In diversity cases, federal courts apply federal law, not the law of the forum state, to decide whether a new trial is warranted under Fed.R.Civ.P. 59. *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir.1996). The district court "must set aside the verdict if it determines that the verdict is against the clear weight of the evidence." *Clay v. Ford Motor Co.*, 215 F.3d 663, 672 (6th Cir.2000). However, the jury retains substantial authority. The district court is "not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 171 (6th Cir.1993). Furthermore, on appellate review, the district court's application of the deferential new-trial standard receives an additional layer of deference. We review the denial of a motion for a new trial only for abuse of discretion. *Clay*, 215 F.3d at 672. We will ordinarily affirm unless we "have a definite and firm conviction that the trial court committed a clear error of judgment." *Ibid*. Put another way, we "accept the jury's verdict if it was reasonably reached." *Ibid*.

Much of the medical evidence in this case raised serious questions whether Nejo's alleged injuries were exaggerated or feigned, and whether any disorders he did suffer might be unrelated to a possible mishap caused by his car losing a wheel in traffic. The jury obviously would have been well within its authority to reject Nejo's claim and enter a verdict for Tamaroff on the ground of no causation or no damages. But it did not decide the case on those grounds, and we must decide the closer question of whether the evidence

reasonably permitted a finding of no negligence.

■ As we read the briefs, the parties have argued the case on the assumption that if Tamaroff's mechanic failed to re-tighten the lug nuts on Mr. Nejo's SUV, then this was negligence. Tamaroff does not discuss the point directly, but Nejo's counsel characterized the case to the district court as a "*res ipsa* case," and Tamaroff has not tried to dispute this in its brief. But if the lug nuts *were* properly tightened, then, based on the evidence before the jury, it is very difficult to see how Mr. Nejo's wheel could have flown off as he claims. Accordingly, it is difficult to see how the jury's verdict can stand unless the jury could reasonably decide that the accident was at least partially staged. Nejo made an affirmative case that he suffered an accident that was caused by failure to tighten the lug nuts. The jury's decision to find no negligence was not reasonable unless some alternative scenario was possible. The scenario would have to explain the damage to the underside of Nejo's car and the fact that the incident occurred shortly after he left the auto dealership where he had his tires rotated. One scenario that would meet that requirement is that in which the accident was staged, perhaps by lifting the SUV with a jack, removing the wheel from the lug studs, and then letting the vehicle drop to the ground, which would damage the underside parts but not the lug studs or body panels. While plaintiff's witness Mr. Stocke opined that this scenario was inconsistent with the damage to the SUV's underside, defendant's witness Mr. Greiger contested his opinion.

We acknowledge some doubt about the plausibility of a "staged accident" scenario. Yet the district court concluded that, in light of the testimony at trial, the competing version of events offered by Nejo was not so clearly more probable than the one

the jury seems to have embraced as to justify a new trial. While the question is close, we cannot say that we have "a definite and firm conviction" that the district court "committed a clear error of judgment" when it reached this decision. *Clay*, 215 F.3d at 672. It is hard to identify *any* sequence of events that makes full sense of the conflicting evidence in this case. That distinguishes this case from precedents such as *Porter*, in which we upheld the grant of a new trial. The plaintiff's infant in *Porter* was injured in a car crash. The child had only a bruise visible on her head. The defendant hospital's physician failed to diagnose the child's spinal injury after the crash, allowing the injury to worsen and cause paralysis. In the first trial, the jury entered a verdict against the hospital on the basis of the negligence of the hospital's *nurses*. (The treating physician had earlier settled with the plaintiff.) The district court granted a new trial, holding that the verdict against the nurses was against the "manifest weight of the evidence." 995 F.2d at 635. This court affirmed on the ground that this was not an abuse of discretion. While there was strong evidence of the physician's responsibility, the evidence of proximate causation against the nurses was insufficient to meet Ohio's strict proximate cause standard. *Id.* at 635–36. The chief piece of evidence against the nurses was that they failed to re-take the child's vital signs during the examination, after taking them and reporting them to the doctor as abnormal when the child was originally admitted. Even plaintiff's experts in *Porter* had taken the view that primary responsibility for the child's condition lay with the doctor, not the nurses. *Id.* at 633–34. In contrast, here there was a genuine conflict of evidence as to whether Tamaroff had actually failed to tighten the lug nuts on Nejo's vehicle, and this conflict was heightened by the doubts sown about

Nejo's credibility. Nejo's competing theory of events was shown to be implausible in several respects. Under these circumstances, the district court acted within its discretion by refusing to grant a new trial.

## III

We also conclude that the district court did not abuse its discretion by deciding to give Standard Jury Instruction 6.01(c).

In a diversity action, state law determines the substance of the jury instructions, while questions regarding the propriety of the instructions are governed by federal law. *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir.2000). This court "review[s] [the] jury instructions as a whole in order to determine whether the instructions adequately inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its decision." *Ibid.* (quotation marks omitted).

The Michigan Court of Appeals has stated the following concerning the propriety of giving SJI 6.01(c):

> [W]here defendant failed to proffer material evidence within its control and questions of fact concerning the reasonableness of such action existed, the trial court's decision to instruct on SJI2d 6.01(c) [is] not an abuse of discretion.

*Clark v. K–Mart Corp.*, 249 Mich.App. 141, 640 N.W.2d 892, 896 (2002). The instruction should be given when "a question of fact arises regarding whether a party has a reasonable excuse for its failure to produce the evidence, the court finds that the evidence was under the party's control and could have been produced by the party, and the evidence would have been material, not cumulative, and not equally available to the other party." *Id.* at 895; *see also* Note on Use of SJI2d 6.01.

That is the case here. Tamaroff's manager, Mr. Klingensmith, gave uncontradicted testimony about the conversation he had with Mr. Nejo when Nejo called from the pool hall. Klingensmith offered to come and tow the disabled car, and then inspect the damage. Nejo refused, and abruptly hung up, on the somewhat querulous ground that Tamaroff would not send a rental car to him sight unseen. Tamaroff never had custody of the damaged parts. Later, evidence was introduced that mechanic Tubbs's repair bill required him to remit the damaged parts to Nejo, and Tubbs testified that he did so. Nejo could not explain what happened to the parts (which weighed 50 to 75 pounds), but he tried to lay the blame for their loss on the memory and cognition problems that, he claimed, resulted from his accident. Because of Nejo's response to Tamaroff's offer in the phone conversation, the district court could reasonably conclude that the parts were "not equally available" to Tamaroff and Nejo. *Clark,* 640 N.W.2d at 895; *compare Brenner v. Kolk,* 226 Mich. App. 149, 573 N.W.2d 65, 68 (1998) (stating that giving SJI 6.01(c) at defendant's request would be "questionable" where the evidence in question was defendant's own car, which plaintiff kept stored for several months after an accident, with defendant's knowledge). The court also properly deemed the parts to be material, non-cumulative evidence, because defendant's accident reconstruction expert, Mr. Greiger, testified that he could have used them to discern whether the accident was staged.

Finally, as defendant points out, the instruction Judge Battani gave, namely 6.01(c), is actually one of the more measured versions of Instruction 6.01, Michigan's adverse-inference instruction. It says merely that the jury "may" infer that the missing evidence would have been adverse to the plaintiff, "if" it believes that plaintiff has provided "no reasonable excuse" for the absence. *Ibid.* This instruction recognized the existence of a fact issue, and did not foreclose the jury from

considering Nejo's excuse that a post-accident cognitive impairment had caused him to mislay the parts.

## IV

For the foregoing reasons, the judgment is AFFIRMED.